USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  8/10/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------X

ARTHUR HUBERT CAMPBELL,                                  :
                                                        :
                              Plaintiff,                :
                                                        :
            -against-                                   :        19-CV-4516 (JLC)
                                                        :
                                                        :
COMMISSIONER OF SOCIAL SECURITY                          :
                                                        :
                              Defendant.                :
                                                        :
---------------------------------------------------------------------------X

**<u>OPINION AND ORDER</u>**

Table of Contents

I. BACKGROUND ....................................................................................... 1

A. Procedural Background........................................................................ 1

B. The Administrative Record ................................................................. 2

  1.   Campbell's Background ................................................................ 2

  2.   Relevant Medical Evidence ........................................................ 4

    a.   Treatment History .................................................................. 4

     i.   Paul Salkin, M.D.—Treating Psychiatrist ................................. 4

     ii.   Ketan Badani, M.D.—Treating Physician ................................ 4

     iii.   Girish Patel, M.D.—Treating Physician ................................ 6

     iv.   Aner Shah, M.D.—Emergency Room Physician................... 9

     v.   Madhav Gudi, M.D.— Sleep Center Physician .................... 10

    b.   Opinion Evidence................................................................... 10

      i.   Paul Salkin, M.D.— Treating Psychiatrist ........................... 10

      ii.   Ketan Badani, M.D.— Treating Physician ........................... 14

      iii.   Girish Patel, M.D.—Treating Physician ............................. 15

      iv.   James Ellis, Ph.D.—Consultative Psychologist.................. 16

      v.   Jeffrey C. Marc, M.D.—Medical Examiner .......................... 18

      vi.   Eric Puestow, M.D.—Medical Examiner.............................. 19

      vii.   Aurelio Salon,—M.D., Consultative Examiner ................... 20

      viii. Lauren Feiden, Psy. D.—Consultative Psychological

        Examiner ............................................................................. 21

      ix.   K. Lieber-Diaz, Psy.D., State Agency Psychological

        Consultant........................................................................... 22

      x.   Wallace Wells, M.D., State Agency Medical

        Consultant........................................................................... 23

  3.   ALJ Hearing ............................................................................. 24

  4.   Supplemental Hearing.............................................................. 27

  II.   DISCUSSION ............................................................................. 29

A. Legal Standards ........................................................................ 29

  1. Judicial Review of Commissioner's Determinations ............................ 29

  2. Commissioner's Determination of Disability ................................... 31

    a. Five-Step Inquiry ..................................................... 32

    b. Duty to Develop the Record ............................................. 33

    c. Treating Physician's Rule ............................................... 35

    d. Claimant's Credibility ................................................. 38

B. The ALJ's Decision ................................................................. 40

C. Analysis ........................................................................... 45

  1. The ALJ Failed to Properly Assess Dr. Salkin's Opinions .................... 46

    a. The ALJ Failed to Develop the Record as to Dr. Salkin ................ 47

    b. The ALJ Failed to Properly Evaluate Dr. Salkin's Opinion
       as One Coming from a Treating Physician ............................ 50

    c. The ALJ Improperly Discounted Dr. Salkin's Opinion Based
       on His Reliance on Campbell's Subjective Statements ............... 54

    d. The Court Cannot Determine Whether the ALJ Erred in
       Evaluating Campbell's Mental Health Treatment as
       Conservative ......................................................... 55

  2. The Appeals Council Erred by Failing to Consider New
       Evidence .............................................................. 56

  3. Campbell's Subjective Statements Regarding His Mental
       Impairments Should be Reevaluated on Remand ......................... 60

  4. The ALJ Did Not Fully Develop the Record as to Campbell's
       Heart Impairments ..................................................... 62

III. CONCLUSION .................................................................... 64

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Arthur Campbell seeks judicial review of a final determination by defendant Andrew M. Saul, Commissioner of the Social Security Administration, who denied Campbell's application for disability insurance benefits under the Social Security Act.  The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, Campbell's motion is granted and the Commissioner's cross-motion is denied.

## I.      BACKGROUND

### A.      Procedural Background

Campbell applied for Disability Insurance Benefits ("DIB") on January 7, 2016, alleging a disability onset date of November 20, 2015.  Administrative Record ("AR"), Dkt. No. 12, at 256–57.  The Social Security Administration ("SSA") subsequently denied his claims on April 1, 2016.  *Id.* at 16.  Thereafter, Campbell requested a hearing in front of an Administrative Law Judge ("ALJ") on May 9, 2016.  *Id.* at 157.  Represented by attorney Renee Moore, Campbell appeared before ALJ Rosanne M. Dummer on March 20, 2018 for an initial hearing, after which the ALJ requested additional information from a medical expert and vocational expert. *Id.* at 64–65, 85, 215.  The ALJ then held a supplemental hearing on August 15, 2018 to allow for Campbell's counsel to further question the medical expert and vocational expert.  *Id.* at 62–84.  Campbell did not attend this supplemental hearing, but attorney John Moran appeared on his behalf.  *Id.* at 62, 64.  One week later, in a decision dated August 22, 2018, the ALJ concluded that Campbell was

not disabled.  *Id.* at 32.  On October 16, 2018, Campbell sought review of the ALJ's decision by the Appeals Council.  *Id.* at 366–70.  His request was denied on March 23, 2019, rendering the ALJ's decision final.  *Id.* at 1–7.

Campbell timely commenced the present action on May 16, 2019, seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  Complaint, Dkt. No. 1.  The Commissioner answered Campbell's complaint by filing the administrative record on September 9, 2019.  AR, Dkt. No. 12.  On November 8, 2019, Campbell moved for judgment on the pleadings (Dkt. No. 13) and submitted a memorandum of law in support of his motion (Dkt. No. 14, "Pl. Mem.").  The Commissioner cross-moved for judgment on the pleadings on March 6, 2020 (Dkt. No. 19) and submitted a memorandum in support of his cross-motion (Dkt. No. 20, "Def. Mem.").  No reply papers were filed.

## B.    The Administrative Record

### 1.    Campbell's Background

Campbell was born on November 23, 1952.  AR at 89.  He was 62 years old at the time of his alleged onset date (November 20, 2015) and 65 years old at the time of his initial hearing before the ALJ (March 20, 2018).  *Id.* at 85, 89, 256.  At the time of his initial hearing before the ALJ, Campbell lived with his wife in an apartment in Manhattan.  *Id.* at 92, 272, 284.  Campbell completed some high school, but did not graduate.  *Id.* at 90 (attended school up to 12th grade but did not graduate); *id.* at 274 (completed 10th grade).  He worked intermittently as a construction worker for 30 years until 2015, at which time he retired.  *Id.* at 90, 92,

2

274.  Campbell suffered multiple bouts of cancer: Campbell was first diagnosed with lung cancer in 2007 and underwent surgery later that year (*id.* at 428–30); years later, in December 2015, Campbell was diagnosed with prostate cancer and underwent another surgery (*id.* at 392, 404–06, 425–27).  Since his surgeries, the cancers have been in remission.  *Id.* at 481, 523, 526.  Campbell also reported that he suffers from high blood pressure, neuropathy, an irregular heartbeat, diabetes, hepatitis C, depression, sleep apnea, and congestive heart failure.  *Id* at 273, 586, 593.

In his submissions to the SSA, Campbell described that he can still complete daily tasks, such as light cleaning and laundry, but feels "tired[ and] irritable, ha[s] trouble focusing, and [is] forgetful."  *Id.* at 285–86.  In addition, Campbell reported that his conditions affect his ability to lift, stand, climb stairs, and use his hands.  *Id.* at 288–89.  For example, his neuropathy makes it painful for Campbell "to squeeze or hold objects" and he sometimes drops things.  *Id.* at 289.  Similarly, his "prostate cancer hurts when [he] lift[s] heavy objects."  *Id.* at 288.  He further explained that, because of his neuropathy and diabetes, "[he] can [barely] stand on [his] feet at times," *id.* at 288, and he experiences shortness of breath while climbing subway stairs.  *Id.* at 289.  Finally, Campbell described that his depression makes him feel as though he cannot take care of himself.  *Id.* at 112.

### 2.     Relevant Medical Evidence

#### a.     Treatment History

##### i.   Paul Salkin, M.D.—Treating Psychiatrist

Psychiatrist Paul Salkin, M.D., treated Campbell for depression approximately once a month, and at times as frequently as two to three times a month, from 2015 through 2018.  *Id.* at 94–95, 496, 541–70, 576, 578.[1]  Dr. Salkin's treatment notes during this period are handwritten and almost entirely illegible. *See, e.g., id.* at 496–500, 542–70.

##### ii.   Ketan Badani, M.D.—Treating Physician

Urologist Ketan Badani, M.D., of Mount Sinai Hospital ("Mt. Sinai") treated Campbell every six months from October 31, 2015 through at least October 9, 2017. *Id.* at 455, 506–07, 523.  Upon referral from Dr. Girish Patel for evaluation of an elevated prostate-specific antigen, Campbell initially visited Dr. Badani on October 31, 2015 to discuss a possible biopsy and the associated risks.  *Id.* at 455–56.[2] Following the biopsy, Dr. Badani diagnosed Campbell with prostate cancer on

---

[1] Campbell stopped receiving mental health counseling from Dr. Salkin after Campbell lost his medical insurance.  *Id.* at 94.

[2] Prostate-specific antigen "[i]s a protein produced by prostate cells." *See generally Prostate-specific antigen (PSA) blood test*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/ency/article/003346.htm (last visited August 2, 2020).

A Transrectal Ultrasound is used during a prostate biopsy to guide a biopsy needle. *See generally Prostate Biopsy*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/prostate-biopsy (last visited August 2, 2020).

December 16, 2015.  *Id.* at 523.  On January 14, 2016, Campbell met with Dr. Badani to discuss the option of a robotic radical prostatectomy.  *Id.* at 484.[3]  After being apprised of the risks, recovery period, and side effects, Campbell elected to undergo the procedure, and Dr. Badani performed the surgery on February 4, 2016.  *Id.* at 484, 517–20.

On February 11, 2016, during his one-week post-operation visit, Campbell reported that he felt well since his surgery and had not experienced any pain.  *Id.* at 485.  Campbell's general appearance showed no acute distress, and his surgical wounds were healing well.  *Id.* at 486.  At his six-week post-operation appointment with Dr. Badani on March 24, 2016, Campbell reported that he still felt well following the surgery, but that he was using two to three pads per day due to mild stress urinary incontinence ("SUI").  *Id.* at 487.  Dr. Badani recorded that Campbell was otherwise doing well after his surgery.  *Id.* at 488.[4]

---

[3] A robotic prostatectomy is a minimally invasive procedure that is performed laparoscopically.  During the procedure, miniaturized robotic instruments pass through incisions in the patient's abdomen and the prostate as well as nearby tissues are removed.  *See generally Robotic Prostatectomy*, JOHNS HOPKINS MEDICINE,  https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/robotic-prostatectomy (last visited June 15, 2020).  A radical prostatectomy is the complete surgical removal of the entire prostate gland.  *See generally Radical Prostatectomy*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/radical-prostatectomy (last visited August 2, 2020).

[4] Stress urinary incontinence occurs when the bladder leaks urine during exertion or physical activity.  *See generally Stress urinary incontinence,* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/ency/article/000891.htm (last visited August 2, 2020).

During the next follow-up office visit on October 3, 2016, Dr. Badani observed that Campbell's mild SUI persisted and he continued to use two pads per day.  *Id.* at 508.  On April 10, 2017, Campbell had another follow-up visit with Dr. Badani and reported that he had been feeling well since his last visit and that he wore one to two pads per day.  *Id.* at 502–03.  Dr. Badani observed that his SUI was slowly improving and that his appearance showed no acute distress.  *Id.*  He recommended that Campbell continue kegel exercises daily.  *Id.*  Campbell's condition improved at the next follow-up visit with Dr. Badani on October 9, 2017, during which Dr. Badani reported rare SUI, and that Campbell only used one pad a day, which was not always wet.  *Id.* at 506.  Campbell did not report any new urinary complaints, and Dr. Badani recommended that Campbell continue kegel exercises.  *Id.*

### iii.   Girish Patel, M.D.—Treating Physician

Girish Patel, M.D., an internal medicine physician at Ronak Medical Care, treated Campbell approximately every eight weeks from April 27, 2017 through at least February 27, 2018 for type 2 diabetes, chronic obstructive pulmonary disease, chronic viral hepatitis, hypertension, malignant neoplasm of unspecified main bronchus, malignant neoplasm of the prostate, congestive heart failure, sleep apnea, and chronic atrial fibrillation.  *Id.* at 531, 535–39, 581, 586.

Dr. Patel prescribed Campbell Metformin to treat his diabetes and Metoprolol to "prevent [a] heart attack." *Id.* at 312.[5]  Campbell was also prescribed

---

[5] Metformin is used to treat type 2 diabetes, and controls the amount of glucose present in the blood.  *See generally Metformin*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a696005.html (last visited August 2, 2020).

Eliquis to prevent blood clots in his legs, Potassium for his low potassium levels, and Spiriva for his chronic obstructive pulmonary disease ("COPD").[6]  Campbell was prescribed Losartan for high blood pressure.  *Id.*[7]

During an initial visit with Dr. Patel on April 27, 2017, Campbell reported feeling tired and fatigued after walking two blocks or standing for 30 to 60 minutes. *Id.* at 531.  He also described that he has to rest after walking and climbing due to dyspnea on exertion ("doe"), and experienced occasional dizziness, which resolves in a few minutes, and occasional increased urinary frequency following his prostate

---

Metoprolol is a beta-blocker which is used to treat high blood pressure.  It is also used to prevent chest pain, improve survival following a heart attack, and in combination with other medications, treat heart failure.  *See generally Metoprolol,* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a682864.html (last visited August 2, 2020).

[6] Eliquis is referred to as Apixaban and treats atrial fibrillation, a condition causing an irregular heartbeat.  Atrial fibrillation makes individuals at a greater risk for blood clots and strokes.  *See generally Apixaban*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a613032.html (last visited August 2, 2020).

Spiriva is also known as tiotropium and helps to prevent "wheezing, shortness of breath, coughing, and chest tightness" in individuals who have chronic obstructive pulmonary disease.  *See generally Tiotropium Oral Inhalation,* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a604018.html (last visited August 2, 2020).

[7] Losartan treats high blood pressure.  It may also be used to reduce the risk of stroke in individuals who have enlarged walls on the heart's left side (ventricular hypertrophy).  *See generally Losartan*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS,  https://medlineplus.gov/druginfo/meds/a695008.html (last visited August 2, 2020).

surgery.  *Id.*[8]  Dr. Patel noted that Campbell had joint pain, low back pain, and numbness.  *Id.* at 532.  Upon physical examination, his appearance, vital signs, and joint exam were found to be normal.  *Id.* at 532–53.  Dr. Patel recommended that Campbell closely comply with his medication, return to the sleep apnea center, use a Continuous Positive Airway Pressure ("CPAP") machine, and monitor his glucose levels.  *Id.* at 533.[9]  Dr. Patel also observed that Campbell had difficulty "walk[ing], climb[ing], [and] doing minimal physical exertional activities" and recommended following up with a cardiologist as he may need a "cardiac cath."  *Id.*  In addition, Dr. Patel's treatment notes reflect that Campbell had undergone a stress test, performed in February of 2017.  *Id.* at 531–32.

Campbell had a follow-up visit with Dr. Patel on December 21, 2017, at which he reported feeling well, and that he could walk several blocks.  *Id.* at 572.  He did not have dyspnea on exertion.  *Id.*  Upon physical examination, Dr. Patel found that Campbell still had joint pain, low back pain, and numbness, but recorded normal results relating to his vital signs, appearance, cardiovascular system, lungs, and

---

[8] Dyspnea refers to shortness of breath or difficulty breathing and may occur due to exercise, nasal congestion, heart, or lung disease.  *See generally Shortness of Breath*, JOHNS HOPKINS MEDICINE: HEART & VASCULAR INSTITUTE, https://www.hopkinsmedicine.org/heart_vascular_institute/conditions_treatments/conditions/shortness_breath.html (last visited August 2, 2020).

[9] CPAP is a machine that is used to treat sleep-related breathing problems such as sleep apnea.  The machine keeps airways open by applying mild air pressure.  It includes a mask or other device that is placed over the nose or nose and mouth, and a motor that blows air into the tube.  *See generally CPAP*, NATIONAL HEART, LUNG, AND BLOOD INSTITUTE, https://www.nhlbi.nih.gov/health-topics/cpap (last visited August 2, 2020).

joints.  *Id.* at 573–74.  Dr. Patel again recommended that Campbell follow up with a cardiologist, return to the sleep center, use a CPAP machine, comply with his medication, and monitor his glucose.  *Id.* at 574.

On February 27, 2018, Campbell saw Dr. Patel for a follow-up visit.  *Id.* at 586.  Campbell reported having dyspnea on exertion upon walking two to three blocks, and lower back pain with different activities, such as bending and turning.  *Id.*  Dr. Patel noted the same symptoms of joint pain, low back pain, and numbness.  *Id.* at 577.  Campbell's physical examination was normal with the exception of an abnormal blister and rash on his left ankle.  *Id.* at 588.  Dr. Patel found that Campbell's symptoms had worsened and he was now unable to climb, walk, stand, or lift more than five pounds.  *Id.*  He also observed that Campbell had dyspnea and was tired.  *Id.*  He concluded that Campbell was not fit for work due to multiple medical problems, and made the same recommendations that he had made on previous visits.  *Id.*

### iv.  Aner Shah, M.D.—Emergency Room Physician

Aner Shah, M.D., treated Campbell during his emergency room visit to Mt. Sinai on February 28, 2018.  *Id.* at 598.  Campbell presented with chest pains and, after receiving an electrocardiogram test (ECK), a blood panel, and chest scans, he was diagnosed with heart palpitations and dysrhythmia.  *Id.* at 597–604.[10]  Dr. Shah directed Campbell to follow up with his primary care physician.  *Id.* at 604.

---

[10] Dysrhythmia, also known as arrhythmia, refers to a heart rate or heart rhythm issue.  When an individual experiences an arrhythmia, his or her heart may beat "too fast, too slowly, or with an irregular rhythm."  *See generally Arrhythmia,*

9

### v.  Madhav Gudi, M.D.— Sleep Center Physician

On February 13, 2018, Madhav Gudi, M.D., treated Campbell for sleep apnea at Eos Sleep Disorders Center.  *Id.* at 590–96.  The copy of Dr. Gudi's treatment notes is partially illegible.  *See id.*  Based on what the Court can discern from these notes, Dr. Gudi performed a sleep study on Campbell and diagnosed him with obstructive sleep apnea.  *Id.* at 593.[11]  Dr. Gudi observed that Campbell's sleep apnea improved to within normal limits with the use of a CPAP machine, and Dr. Gudi provided Campbell with a prescription for a CPAP machine.  *Id.* at 591–93.

### b.  Opinion Evidence

### i.  Paul Salkin, M.D.— Treating Psychiatrist

In a Mental Impairment Questionnaire dated April 10, 2017, Dr. Salkin diagnosed Campbell with Major Depressive Disorder and noted his history of prostate cancer and congestive heart failure.  *Id.* at 496.  Dr. Salkin also reported prescribing Wellbutrin to treat Campbell's depression.  *Id.* at 496, 576.[12]  According

---

NATIONAL HEART, LUNG, AND BLOOD INSTITUTE, https://www.nhlbi.nih.gov/health-topics/arrhythmia (last visited August 2, 2020).

[11] Sleep apnea is a disorder that causes breathing to become very shallow or even pause for anywhere from a few seconds to a minute during sleep.  The most common form of sleep apnea is obstructive sleep apnea, which may cause a blocked airway or collapsed airway during sleep.  Sleep apnea may cause individuals to be more drowsy during the day.  *See generally Sleep apnea* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/sleepapnea.html (last visited August 2, 2020).

[12] Wellbutrin is known as Bupropion and can be used to treat depression.  *See generally Bupropion*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS,  https://medlineplus.gov/druginfo/meds/a695033.html (last visited August 2, 2020).

to Dr. Salkin, Campbell's symptoms included a depressed mood, difficulty thinking or concentrating, a pervasive loss of interests, decreased energy, and sleep disturbances.  *Id.* at 497.  Dr. Salkin observed that Campbell's most frequent and/or severe symptom was depression.  *Id.* at 498.  In a work-like setting, Dr. Salkin reported that Campbell experiences episodes of decompensation or deterioration that cause Campbell to withdraw socially.  *Id.*  Dr. Salkin opined that Campbell had moderate limitations in all mental activities associated with "understanding and memory."  *Id.* at 499.  Dr. Salkin further opined that Campbell had a "moderate-to-marked limitation" in all mental activities associated with "social interactions," "adaptation" and "concentration and persistence" (but for one exception).  *Id.*[13]  Dr. Salkin estimated that Campbell would likely miss work more than three times per month due to his impairments.  *Id.* at 500.  In Dr. Salkin's medical opinion, Campbell's symptoms apply as far back as two years.  *Id.*

In a legible note dated January 22, 2018, Dr. Salkin reported that Campbell "is much improved, and his depression is fully controlled."  *Id.* at 578.  He also opined that "there is no psychiatric problem that would interfere with his driving commercially."  *Id.*

Dr. Salkin completed another Mental Impairment Questionnaire on March 12, 2018.  *Id.* at 615–19.  By that time, Campbell had stopped seeking treatment from Dr. Salkin due to lack of insurance coverage.  *Id.* at 615.  Dr. Salkin restated

---

[13] Under the category of "concentration and persistence," Dr. Salkin observed a moderate limitation in Campbell's ability to maintain attention and concentration for extended periods.  *Id.*

his diagnosis of major depression and identified signs and symptoms with respect to

Campbell's mood (depressed mood; blunt, constricted and flat affect), behavior

(anhedonia/pervasive loss of interests; decreased energy; psychomotor retardation;

social withdrawal or isolation), attention (difficulty thinking or concentrating), and

sleep (insomnia). *Id.* at 616. Dr. Salkin identified depression as the most frequent

and/or severe symptom. *Id.* at 617. In a change from his previous opinion, Dr.

Salkin opined that Campbell did not experience episodes of decompensation or

deterioration in a work or work-like setting. *Id.* In addition, Dr. Salkin found that

Campbell had moderate-to-marked limitations in all areas of "understanding and

memory"; moderate-to-marked limitations and two marked limitations in

"concentration and persistence"; moderate limitations in all areas of "social

interactions"; and moderate-to-marked limitations in all areas of "adaptation." *Id.*

at 618. He opined that Campbell would likely be absent from work two to three

times per month. *Id.* at 619.

On September 26, 2018, Dr. Salkin also completed a

Psychiatric/Psychological Impairment Questionnaire, which was submitted to the

Appeals Council. *Id.* at 57–61, Def. Mem. at 14.[14] Although Dr. Salkin previously

indicated that he was no longer treating Campbell as of March 13, 2018, he reported

that he had nonetheless most recently examined Campbell in July 2018. AR at 57,

---

[14] The Commissioner's Memorandum of Law states that Dr. Salkin's September 26, 2018 questionnaire was submitted to the Appeals Council. Def. Mem. at 14. Although the record does not confirm that the questionnaire was submitted to the Appeals Council, Campbell does not argue otherwise.

328.  Dr. Salkin reiterated his diagnosis of major depressive disorder and identified signs and symptoms which supported his diagnosis, including a depressed mood, persistent or generalized anxiety, flat and labile affect, suicidal ideation, difficulty thinking or concentrating, easy distractibility, poor memory, anhedonia, appetite disturbances/weight change, decreased energy, and sleep apnea.  *Id.* at 58.  Dr. Salkin identified depression and suicidal ideation as Campbell's most severe symptoms.  *Id.* at 59.  Dr. Salkin also opined that Campbell's "depression makes his congestive heart failure more dangerous."  *Id.*  He found that Campbell would have episodes of decompensation or deterioration in a work-like setting and concluded that "[d]epression makes him unable to work."  *Id.* at 59.  As a result of Campbell's impairments, Dr. Salkin found that Campbell would likely miss work more than three times per month.  *Id.*

Regarding Campbell's mental limitations, Dr. Salkin opined that, in the area of "understanding and memory," Campbell had moderate-to-marked limitations in remembering locations and work-like procedure, and understanding and remembering one-to-two step instructions; and marked limitations in understanding and remembering detailed instructions.  *Id.* at 60.  Campbell further had marked limitations in all aspects in the area of "concentration and persistence." *Id.*  In "social interactions," Campbell had "none-to-mild" limitations in maintaining socially appropriate behavior and adhering to basic standards of neatness; moderate limitations in interacting appropriately with the public, and getting along with coworkers or peers without distracting them; "moderate-to-marked" limitations in

13

asking simple questions or requesting assistance; and marked limitations in accepting instructions and responding appropriately to criticism from supervisors. *Id.* Under the category of "adaptation," Campbell had moderate limitations responding appropriately to workplace changes, being aware of hazards and taking appropriate precautions, and making plans independently; and "moderate-to-marked" limitations travelling to unfamiliar places and setting realistic goals. *Id.* Dr. Salkin opined that Campbell would likely be absent from work more than three times per month. *Id.* at 61. He found Campbell's symptoms and related limitations applied as far back as March 1, 2015. *Id.*

## ii.  Ketan Badani, M.D.— Treating Physician

Dr. Badani completed a Cancer Impairment Questionnaire for Campbell on April 20, 2017, in which he reported that Campbell's prostate cancer was in complete remission since his February 4, 2016 surgery. *Id.* at 523–29. Dr. Badani described that Campbell's primary symptoms due to his prostate cancer were mild leaking and stress urinary incontinence, which required him to use one to two pads per day. *Id.* at 526. These symptoms had lasted, or were expected to last, for at least 12 months. *Id.* Dr. Badani opined that Campbell could sit, stand, or walk for six or more hours in an eight-hour workday, and lift or carry up to 10 pounds frequently and 20 or more pounds occasionally, *id.* at 527, and he concluded that Campbell would likely be absent from work less than once per month due to his condition. *Id.* at 529.

14

### iii.　　　Girish Patel, M.D.—Treating Physician

Dr. Patel completed a Disability Impairment Questionnaire for Campbell on April 27, 2017. *Id.* at 535–39. Dr. Patel appears to refer to his April 27, 2017 treatment notes in many of his answers to the questionnaire. *Id.*[15]

Dr. Patel opined that Campbell could sit for four hours and stand and/or walk for two hours in an eight-hour workday. *Id.* at 537. Dr. Patel also concluded that Campbell could lift or carry up to five pounds frequently and five to 10 pounds occasionally, but never more than 10 pounds. *Id.* Dr. Patel opined that Campbell would need to take 30-minute breaks every two hours during an eight-hour work day. *Id.* at 538. In addition, Dr. Patel found that Campbell's symptoms would frequently interfere with his attention and concentration, he would likely be absent from work two to three times per month due to his impairments, and that his impairments were expected to last at least 12 months. *Id.* at 538–39.

Dr. Patel also completed a Disability Impairment Questionnaire, dated March 8, 2018. *Id.* at 581–85. Although most of the questionnaire remains blank, Dr. Patel incorporated by reference his treatment notes, dated February 27, 2018, which list the same impairments and the same symptoms identified in the previous questionnaire. *Id.* at 585–86.

---

[15] Dr. Patel wrote "see attached" for some of the answers in the questionnaire. *Id.* at 535–36. Although there are no attachments to the questionnaire, Dr. Patel's treatment notes, dated April 27, 2020, immediately precede the questionnaire. *See id.* at 531–33. The Court therefore interprets "see attached" as incorporating those notes by reference.

####     iv.        James Ellis, Ph.D.—Consultative Psychologist

James Ellis, Ph.D., a consultative psychologist, interviewed Campbell and

authored a Psychiatric Evaluation on November 12, 2018.  *Id.* at 46–48.  Dr. Ellis

reported that Campbell appeared well-groomed and maintained fair eye contact

throughout the in-person interview, but spoke at a slow rate and had a dysphoric

and tearful affect.  *Id.* at 47–48.  He also reported that Campbell had good attention

and concentration and his thoughts remained relevant to the interview questions.

*Id.*  Campbell reported that he has "chronic thoughts of death" but denied

"homicidal ideation."  *Id.* at 48.  Dr. Ellis found that "since [Campbell] was first

diagnosed with cancer in 2007, he has experienced periods of extremely depressed

mood, hypersomnia, anhedonia, changes in appetite, and feelings of hopelessness,

irritability and anxious distress."  *Id.* at 46.  Campbell described that his "most

recent depressive episode began after his diagnosis of prostate cancer in 2016 and

subsequent surgery" and he finds himself thinking "no one cares about you," "you

can't provide for your wife, you aren't a man."  *Id.* at 46–47.  Campbell reported

"recurrent thoughts of death" but explained that "his close relationship with his

wife is a deterrent to attempting suicide."  *Id.* at 47.  Based on these reported

symptoms, Dr. Ellis diagnosed Campbell with recurrent major depressive disorder,

without psychotic features, with moderate to severe anxious distress.  *Id.* at 48.  Dr.

Ellis also diagnosed Campbell with a relation problem related to a mental disorder

16

as well as substance abuse disorders which he found all to be in sustained remission. *Id.*

Dr. Ellis also completed a Psychiatric/Psychological Impairment Questionnaire on the same day. *Id.* at 39–43. Dr. Ellis restated his diagnosis of major depressive disorder and identified symptoms with respect to Campbell's mood (a depressed mood; persistent or generalized anxiety; an abnormal affect; a hostile or irritable mood), thought (suicidal ideation), fear (paranoia/suspiciousness; vigilance; and scanning), behavior (anhedonia; appetite disturbances; weight changes; personality changes; decreased energy; abnormally slowed speech; and social withdrawal), and sleep (excessive sleep). *Id.* at 39–40. Dr. Ellis reported Campbell's most severe symptoms to be irritability, decreased energy, social withdrawal, and hypersomnia. *Id.* at 41. He opined that Campbell's depressed mood leads to social withdrawal. *Id.*

Dr. Ellis also found that Campbell had moderate limitations in "understanding and memory"; "moderate-to-marked" limitations in "concentration and persistence"; and no limitations to "moderate-to-marked" limitations in "social interactions." *Id.* at 42. With respect to the "adaptation" category of mental activities, Dr. Ellis opined that Campbell had marked limitations maintaining attention and concentration for an extended period of time, working in coordination with or near others without distraction, ability to complete a workday without interruption, and perform at a consistent pace without periods of rests of unreasonable length or frequency. *Id.* Campbell had "none-to-mild" limitations in

17

being aware of hazards and taking appropriate precautions.  *Id.*  Dr. Ellis opined

that Campbell's symptoms and limitations extended back to March 1, 2015 and, on

average, Campbell would likely be absent from work more than three times per

month due to his depression.  *Id.* at 43.

### v.        Jeffrey C. Marc, M.D.—Medical Examiner

On January 22, 2018, Jeffrey C. Marc, M.D., examined Campbell and

completed a Medical Examination Report Form for a commercial driver's license.

*Id.* at 49–54.  Dr. Marc found that Campbell met the standards for a commercial

driving license, but periodic monitoring of sleep apnea was required.  *Id.* at 52.  As a

result, Campbell qualified as a commercial driver for three months only.  *Id.*

Dr. Marc completed another Medical Examination Report for a commercial

driver's license on July 2, 2018.  *Id.* at 662–67.  Dr. Marc indicated that Campbell's

depression was controlled through medication.  *Id.* at 664.  Dr. Marc found that

Campbell met the standards for a commercial driving license, but required periodic

monitoring due to high blood pressure and "DM2."  *Id.* at 665.[16]  On this occasion,

Dr. Marc certified Campbell's commercial driver's license for one year.  *Id.*

---

[16] DM2 is a form of myotonic dystrophy which makes muscles tense for a prolonged
period of time.  It can also make muscles weak, pain, and stiff.  *See generally
Myotonic dystrophy type 2,* NATIONAL INSTITUTE OF HEALTH: GENETIC AND
RARE DISEASES INFORMATION CENTER,
https://rarediseases.info.nih.gov/diseases/9728/myotonic-dystrophy-type-2 (last
visited August 2, 2020).

### vi.        Eric Puestow, M.D.—Medical Examiner

On March 29, 2018, the ALJ requested a professional opinion from Eric

Puestow, M.D., in connection with Campbell's disability claim.  *Id.* at 621.  Dr.

Puestow supplied the ALJ with a Medical Source Statement on April 9, 2018, in

which he opined that Campbell has diabetes and hypertension with "[n]o

documented end organ damage[,]" medically controlled atrial fibrillation, and "lower

lumbar degenerative disc disease with no signs or symptoms of radiculopathy or

canal stenosis."  *Id.* at 637.  Dr. Puestow also opined that Campbell has Hepatitis C

"treated in the remote past."  *Id.*  Dr. Puestow found no evidence of adenocarcinoma

of the prostate (resected in February 2016) or lung cancer (resected in June 2007),

"no documented neuropathy," and that Campbell's sleep apnea was controlled with

a CPAP machine.  *Id.*  He also found Campbell's polysubstance abuse to be in

remission.  *Id.*  Dr. Puestow opined that Campbell could lift or carry up to 10

pounds continuously, 11–20 pounds frequently, and 21–50 pounds occasionally, but

never more than 50 pounds.  *Id.* at 641.  He found that Campbell could sit for eight

hours and stand or walk for four hours in an eight-hour workday, could frequently

stoop, kneel, crouch, crawl, and climb stairs and ramps, but could never climb

ladders or scaffolds due to his sleep apnea.  *Id.* at 642, 644.

Dr. Puestow opined that none of Campbell's impairments established by the

medical evidence demonstrated that Campbell met or equaled any impairment

described in the Listing of Impairments.  *Id.* at 638.  Although Campbell has many

impairments, Dr. Puestow found "few objective limiting physical findings." *Id.* at 640.

### vii.  Aurelio Salon,—M.D., Consultative Examiner

The Division of Disability Determination referred Campbell to Aurelio Salon, M.D., who performed an internal medicine examination of Campbell on February 23, 2016. *Id.* at 471. Dr. Salon summarized Campbell's current medications, social history, and activities of daily living. *Id.* at 471–72. Dr. Salon also performed a physical examination (including an examination of Campbell's lungs and heart), musculoskeletal exam, neurological exam, and mental status screening. *Id.* at 473–74. Dr. Salon found that Campbell had a regular heart rhythm and normal chest and lung function. *Id.* at 473. Campbell's musculoskeletal exam showed full flexion of the cervical spine and lumbar spine. *Id.* at 474. No sensory deficits were noted during Campbell's neurological exam and his upper and lower extremities showed a strength of five out of five. *Id.* During Campbell's mental status screening, Dr. Salon found that Campbell had a normal affect, maintained eye contact, and "appeared oriented in all spheres." *Id.* Dr. Salon also found no evidence of impaired judgment nor significant memory impairment. *Id.*

Dr. Salon diagnosed Campbell with history of recently diagnosed prostate cancer, hypertension, history of diabetes mellitus, history of peripheral neuropathy, history of surgery for right lung cancer, history of depression, hepatitis C, superficial ulceration left big toe, and obesity. *Id.* at 474–75. Dr. Salon opined that Campbell's prognosis was "fair," and that no objective findings existed to establish

that Campbell would be restricted in his ability to sit or stand, but the evidence did demonstrate restrictions in his ability to climb, push, pull or carry heavy objects due to his recent history of prostate cancer.  *Id.* at 475.

### viii.    Lauren Feiden, Psy. D.—Consultative Psychological Examiner

Lauren Feiden, Psy. D., performed a psychiatric evaluation of Campbell on February 23, 2016.  *Id.* at 478.  Dr. Feiden reported that Campbell had a dysphoric affect and dysthymic mood, intact attention and concentration, but below average intellectual functioning.  *Id.* at 480.  Campbell reported that he could dress, bathe, and groom himself, take public transportation on his own, and perform some household chores, such as cook, clean, and do laundry.  *Id.*

Dr. Feiden found that Campbell could "follow and understand simple directions and instructions[,] []perform simple tasks independently, maintain attention and concentration, and make appropriate decisions."  *Id.* at 481. However, Dr. Feiden also observed that Campbell was mildly limited in his ability to "appropriately deal with stress, relate adequately with others, and maintain a regular schedule," and moderately limited in his ability to "learn new tasks and perform complex tasks independently."  *Id.*  Dr. Feiden opined that these difficulties were due to both psychiatric symptoms and cognitive deficits, but that Campbell's psychiatric problems were not "significant enough to interfere with [his] ability to function on a daily basis."  *Id.*

Dr. Feiden diagnosed Campbell with cocaine abuse (in sustained remission), alcohol abuse (in sustained remission), and opioid abuse (in sustained remission),

but she ruled out depressive disorder.  *Id.*  Dr. Feiden gave Campbell a fair prognosis given his symptoms at the time, and recommended that he "[c]ontinue with individual psychological therapy and psychiatric intervention as currently provided and group therapy."  *Id.*

### ix.      K. Lieber-Diaz, Psy.D., State Agency Psychological Consultant

State agency psychological consultant K. Lieber-Diaz provided an evaluation of Campbell on March 31, 2016, and found that Campbell was not significantly limited in remembering "locations and work-like procedures" or remembering "very short and simple instructions," but was moderately limited in understanding and remembering "detailed instructions."  *Id.* at 140–42.

Regarding Campbell's "concentration and persistence," she found that he was not significantly limited in his ability to "carry out very short and simple instructions," "maintain attention and concentration for extended periods," "perform activities within a schedule, maintain regular attendance, and be punctual." *Id.* She also reported no significant limitations in his ability to "sustain an ordinary routine without special supervision," "work in coordination with or in proximity to others without being distracted by them," and make "simple work-related decisions," but moderate limitations in his ability to "carry out detailed instructions," "complete a normal work day and work week without interruptions from psychologically based symptoms," and "perform at a consistent pace without an unreasonable number and length of rest periods."  *Id.* at 140–42.

With respect to Campbell's social interaction, Dr. Lieber-Diaz found that Campbell was not significantly limited in his ability to "interact appropriately with the general public," "ask simple questions or request assistance," and "accept instructions and respond appropriately to criticism from supervisors." *Id.* at 141. Campbell was also not significantly limited in his ability to "get along with coworkers or peers without distracting them or exhibiting behavioral extremes," or "maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness." *Id.*

Regarding adaptation limitations, Dr. Liber-Diaz found that Campbell was moderately limited in his ability to "respond appropriately to changes in the work setting," but not significantly limited in his ability to be "aware of normal hazards or and take appropriate precautions," "travel in unfamiliar places or use public transportation," and "set realistic goals or make plans independently of others." *Id.* at 141. Dr. Lieber-Diaz opined that Campbell retained the capacity to "meet the basic mental demands of unskilled work." *Id.* at 142.

### x.   Wallace Wells, M.D., State Agency Medical Consultant

State agency medical consultant Wallace Wells, M.D., reviewed the relevant medical evidence and conducted a medical evaluation on March 23, 2016. *Id.* at 135. Dr. Wells found that Campbell's medically determinable impairments could reasonably cause some limitation in his functioning, but not to the degree alleged by Campbell. *Id.* at 137. Regarding exertional limitations, Dr. Wells concluded that Campbell could lift or carry 50 pounds occasionally and 25 pounds frequently, stand

and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. *Id.* at 138. Dr. Wells found no limitation in Campbell's ability to push or pull, nor any postural, manipulative, visual, or communicative limitations. *Id.* However, Dr. Wells found environmental limitations and recommended that Campbell avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. *Id.* at 139. Dr. Wells concluded that Campbell did not have the residual functional capacity ("RFC") to perform his past work, and is limited to unskilled work involving, at most, medium strength. *Id.* at 142–43.

### 3. ALJ Hearing

Campbell appeared before the ALJ via video conference on March 20, 2018. *Id.* at 87, 174. The ALJ conducted the hearing from the National Hearing Center in Falls Church, VA, and Campbell participated from the regional office in New York. *Id.* at 87. Campbell's attorney, Renee Moore, and vocational expert ("VE") David Van Winkle were also present. *Id.* At the hearing, Campbell testified that he was employed as a construction worker for approximately 30 years until he stopped working in June 2014 or 2015. *Id.* at 90. Campbell explained that he cannot work because of his heart problem, diabetes, and neuropathy. *Id.* at 91–92.

Campbell testified that he has congestive heart failure and his heart bothers him when he walks up stairs or hills, or when he walks "around the block a second time." *Id.* at 108, 111. He is "afraid of walking up stairs" and explained that "if

there's [sic] two or three landings, [he] ha[s] to stop at each landing for a couple of seconds to a minute." *Id.* at 111.

When asked about his typical day, Campbell testified that he wakes up at 4:30 a.m. or 5:00 a.m., watches television, walks around the block, and sits in the park. *Id.* at 92–93. He assists his wife with light housework, such as laundry, and enjoys feeding birds and reading magazines. *Id.* at 93. Campbell testified that he feels depressed and "can't even take care of [himself]." *Id.* at 112. Campbell stated that he stopped going to mental health counseling because his medical insurance ended, but that he was still taking Wellbutrin at the time of the hearing. *Id* at 94–96.

Campbell described that he takes medication to control his diabetes, but experiences symptoms such as urination and neuropathy. *Id.* at 101. Campbell testified that his neuropathy causes numbness and a throbbing, "needle-like sensation" in his fingers and feet. *Id.* at 102. He stated that he experiences numbness in both his feet "[p]ractically every day." *Id.* When he has these episodes, he takes off his shoes, walks around in slippers, and rubs his feet. *Id.* at 103. He testified that he has some difficulty using his hands when there is numbness in his fingers. *Id.* at 104.

Campbell described that he is still recovering from his prostate surgery and visits Dr. Badani approximately every six months to monitor his progress. *Id.* at 91. He testified that he had to wear a pad during the hearing because he continues to experience urinary leakage. *Id.* at 96–97. Campbell estimated that he uses the

25

restroom at least five to six times between the time he wakes up and lunchtime, approximately six times from lunchtime to dinner, and at least three or four times during the night.  *Id.* at 97–98.  Campbell stated that "it's still an up and down situation where [he is] all right one minute and the next minute [he] ha[s] to run to the restroom."  *Id.* at 97.  As a result, he has resorted to monitoring the amount of liquid he drinks.  *Id.*

The ALJ described a hypothetical individual who could lift and carry 25 pounds frequently and 50 pounds occasionally; sit about six hours in an eight-hour workday; stand or walk about six hours in an eight-hour workday; understand, remember and carry out instructions; and sustain attention and concentration for two-hour segments in an eight-hour day.  *Id.* at 115–16.  The ALJ further described this hypothetical person as someone who is able to interact with others (except for complex interactions) and adapt to changes in the work setting for routine and repetitive work.  *Id.*  The ALJ added that the hypothetical person should avoid pulmonary irritants.  *Id.*  The VE testified that this hypothetical person could not perform any of Campbell's past work.  *Id.*  Assuming that the hypothetical person is a person of Campbell's age, education, and past history of work, the VE then stated that occupations at a medium exertional level exist for that profile, including those of a hand packager, warehouse laborer, packaging machine operator, sandwich maker, and courtesy clerk.  *Id.* at 116–17.

In addition to scheduled breaks, the ALJ asked the VE whether the jobs identified would provide an allowance for extra unscheduled restroom breaks.  *Id.*

26

at 118.  The VE explained that restrooms would be available in all of the occupations he had described, and that using the restroom two to three times outside of scheduled breaks would not likely jeopardize employment as long as the breaks were approximately five minutes in length, but it would likely be an issue if they were longer than 10 minutes each.  *Id.* at 118–19.

Next, the VE testified that a person who was off task about 25 percent of the workday, who may need to take unscheduled breaks two to three times daily in addition to scheduled breaks, or who may be absent from work three to four days a month would not be able to perform any of the jobs identified or any job in the national economy.  *Id.* at 119, 122.  Finally, the VE testified that a person who was frequently limited from interacting appropriately with the public could not perform the job of a courtesy clerk.  *Id.* at 125.

### 4.   Supplemental Hearing

On August 15, 2018, the ALJ held a supplemental hearing at the request of Campbell's counsel.  *Id.* at 64.  The ALJ appeared by video from Falls Church, Virginia, and John Moran (Campbell's attorney), Dr. Kustar (medical expert), and David Van Winkle (vocational expert) appeared by phone.  *Id.*  Campbell did not appear at this supplemental hearing.  *Id.*  At the hearing, Moran asked Dr. Kustar whether the record established that Campbell had been diagnosed with COPD and congestive heart failure.  *Id.* at 67.  Dr. Kustar testified that in order to confirm a COPD diagnosis he would need to review valid pulmonary functions or other objective documentation, which he did not see in the record.  *Id.* at 67–68.  He also

testified that he did not have sufficient evidence to confirm a congestive heart failure diagnosis because the record lacked any heart "caths," echocardiograms, or stress tests.  *Id.* at 68.[17]  Dr. Kustar stated that Campbell's medications (including Amlodipine, Losartan, and Lasix) are consistent with a diagnosis of heart failure, but use of these medications alone is not enough to "diagnose the condition."  *Id.* at 69.  Dr. Kustar also questioned Campbell's hypoglycemia, testifying that he is certain Campbell would not have received a commercial driving license if he had significant hypoglycemia.  *Id* at 70.  In order to objectively document Campbell's hypoglycemia, Dr. Kustar would require proof of "some loss of reflexes, some sensory disturbance, particularly a monofilament test." *Id.* at 71.

Dr. Kustar opined that someone like Campbell—given his age, prostate surgery, and use of Lasix—would need to use the restroom frequently and should have unlimited access to brief, four- or five-minute restroom breaks.  *Id.* at 73–75. Dr. Kustar also testified that stress incontinence could increase from lifting weight. *Id.* at 77.

The VE then testified that a hypothetical person limited to standing and walking for two hours in an eight-hour day would not be able to perform any of the jobs that the VE had previously identified as viable for an individual like Campbell.

---

[17] A cardiac catheterizations or cardiac "cath" is inserted into the blood vessels and threaded into the heart in order to perform tests on the heart.  These tests may include measuring pressure within the heart chambers or taking blood samples to measure oxygen levels.  *See generally Cardiac Catheterization*, JOHNS HOPKINS MEDICINE,  https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/cardiac-catheterization (last visited August 2, 2020).

*Id.* at 79–80.  The VE also testified that an individual who is limited to frequently lifting five pounds and occasionally lifting 10 pounds would similarly not be able to perform any of the identified jobs.  *Id.*  Regarding breaks and absences, however, an individual who took unscheduled breaks for four to five minutes every hour would qualify for the positions.  *Id.* at 81.  The VE acknowledged that auto detailers and lunch truck drivers would not necessarily have unlimited access to a bathroom, but porters and hand packagers would.  *Id.* at 80.  Finally, although the VE opined that employers would have different tolerances for the amount of days an employee could miss from work, in the VE's experience, employers of unskilled and entry-level occupations may permit a total of five to eight unanticipated absences in a year.  *Id.* at 81.

## II.   DISCUSSION

### A. Legal Standards

### 1.   Judicial Review of Commissioner's Determinations

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides."  42 U.S.C. § 405(g).  The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence.  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson*

*v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high").

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g).

In certain circumstances, the court may remand a case solely for the calculation of benefits, rather than for further administrative proceedings. "In . . . situations[ ] where this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, [the court has] opted simply to remand for a calculation of benefits." *Michaels v. Colvin*, 621 F. App'x 35, 38–39 (2d Cir. 2015) (summary order) (quoting *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)) (internal quotation marks omitted). The court may remand solely for the calculation of benefits when "the records provide[ ] persuasive evidence of total disability that render[s] any further proceedings pointless." *Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 1999). However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

### 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical

or mental impairments must be "of such severity that [the claimant] is not only

unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the

national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet

the statutory definition of disability, the Commissioner "must make a thorough

inquiry into the claimant's condition and must be mindful that 'the Social Security

Act is a remedial statute, to be broadly construed and liberally applied.'"  *Mongeur*,

722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)).

Specifically, the Commissioner's decision must take into account factors such as:

"(1) the objective medical facts; (2) diagnoses or medical opinions based on such

facts; (3) subjective evidence of pain or disability testified to by the claimant or

others; and (4) the claimant's educational background, age, and work experience."

*Id.* (citations omitted).

### a.   Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential

evaluation process' to determine whether a claimant is disabled[.]"  *Estrella v.*

*Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R.

§ 404.1520(a)(4).  First, the Commissioner must establish whether the claimant is

presently employed.  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is unemployed, at

the second step the Commissioner determines whether the claimant has a "severe"

impairment restricting her ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).  If the

claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is considered disabled. *Id.*; 20 C.F.R. § 404.1520(d). If not, the Commissioner continues to the fourth step and determines whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b.    Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). As part of this duty, the ALJ must "investigate the facts and

develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111.  Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history.  *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§ 404.1512(d)–(f)).  This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity."  *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question.  Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record."  *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)).  The ALJ must develop the record even where the claimant has legal counsel.  *See*, *e.g.*, *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  Remand is appropriate where this duty is not discharged.  *See*, *e.g.*, *Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported

by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c.   Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(c), 416.927(d)) (internal quotation marks omitted).[18]  A treating physician's opinion is given controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).  The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502.  Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the

---

[18] Revisions to the regulations in 2017 included modifying 20 C.F.R. § 404.1527 to clarify and add definitions for how to evaluate opinion evidence for claims filed before March 27, 2017.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017).  Accordingly, this Opinion and Order applies the regulations that were in effect when Campbell's claims were filed with the added clarifications provided in the 2017 revisions.

medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).

A treating physician's opinion is not always controlling.  For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner.  *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").  Additionally, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight."  *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis."  *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician

if clinical findings are inadequate).  As a result, "the 'treating physician rule' is

inextricably linked to a broader duty to develop the record.  Proper application of

the rule ensures that the claimant's record is comprehensive, including all relevant

treating physician diagnoses and opinions, and requires the ALJ to explain clearly

how these opinions relate to the final determination."  *Lacava v. Astrue*, No. 11-CV-

7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this

Circuit, the [treating physician] rule is robust."), *adopted by* 2012 WL 6621722 (Dec.

19, 2012).

To determine how much weight a treating physician's opinion should carry,

the ALJ must consider the so-called "*Burgess* factors" outlined by the Second

Circuit:

> (i) the frequency of examination and the length, nature
> and extent of the treatment relationship; (ii) the evidence
> in support of the treating physician's opinion; (iii) the
> consistency of the opinion with the record as a whole; (iv)
> whether the opinion is from a specialist; and (v) other
> factors brought to the Social Security Administration's
> attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see also Burgess,* 537 F.3d at 129; 20

C.F.R. § 404.1527(c)(2).  This determination is a two-step process.  "First, the ALJ

must decide whether the opinion is entitled to controlling weight."  *Estrella*, 925

F.3d at 95.  Second, if, based on these considerations, the ALJ declines to give

controlling weight to the treating physician's opinion, the ALJ must nonetheless

"comprehensively set forth reasons for the weight" ultimately assigned to the

treating source.  *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133

(responsibility of determining weight to be afforded does not "exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)).  If the ALJ decides the opinion is not entitled to controlling weight, "[a]n ALJ's failure to 'explicitly' apply these '*Burgess* factors' when [ultimately] assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96 (quoting *Selian*, 708 F.3d at 419–20).  The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted).  Indeed, "[c]ourts have not hesitate[d] to remand [cases] when the Commissioner has not provided good reasons." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

### d.    Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006).  "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Id.* (quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)).  Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10

(internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)). Among the kinds of evidence that the ALJ must consider (in addition to objective medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. [f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. [a]ny measures other than treatment the individual uses or has used to relieve pain or other

> symptoms (e.g., lying flat on his back, standing for 15 to
> 20 minutes every hour, or sleeping on a board); and 7.
> [a]ny other factors concerning the individual's functional
> limitations and restrictions due to pain or other
> symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

## B. The ALJ's Decision

In a 17-page decision dated August 22, 2018, the ALJ found Campbell not to be disabled under the Social Security Act. AR at 16–32.  At step one of the five-step inquiry, the ALJ found that Campbell had not engaged in substantial gainful activity since November 20, 2015, his alleged onset date. *Id.* at 18.  At step two, the ALJ concluded that Campbell had the severe impairments of "status-post February 2016 robot assisted laparoscopic radical prostatectomy and obstructive sleep apnea." *Id.*  However, the ALJ found that Campbell's obesity, history of lung cancer, depression, and history of substance use were not severe. *Id.* at 18–20.

At step three, the ALJ determined that Campbell did not have any impairment or combination of impairments that met or equaled the severity of any of the listed impairments contained in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* at 20.  In making this finding, the ALJ relied on the opinion of Dr. Puestow, who noted that Campbell's impairments were not "listing level." *Id.*

Prior to evaluating step four, the ALJ determined Campbell's RFC. *Id.*  The ALJ found that Campbell could perform medium work, lift or carry 50 pounds occasionally and 25 pounds frequently, sit for eight out of eight hours (four hours at

a time), stand or walk six out of eight hours (three hours at a time), and frequently climb stairs and ramps, balance, kneel, stoop, crouch, crawl, but that he should avoid scaffolds, ladders, and unprotected heights. *Id.* She also determined that he could operate a motor vehicle and occasionally work with moving mechanical parts. *Id.* Regarding his mental impairments, the ALJ concluded that Campbell could comprehend, remember, and carry out instructions; sustain attention and concentration for two-hour segments of time; adapt to changes in the work setting for routine repetitive work; and have interactions with others, but not complex interactions. *Id.*

In formulating this RFC, the ALJ found that Campbell's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but concluded that his statements regarding the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 23. The ALJ provided a number of reasons to support this conclusion. First, she observed that Campbell's testimony regarding frequent restroom breaks was contrary to his progress notes following his prostate surgery, which demonstrate that Campbell experienced "minimal to rare urinary incontinence, and normal to undetectable prostate-specific antigen (PSA) status post surgery." *Id.* at 24. Second, the ALJ found that Campbell's testimony that his heart problems, diabetes, and neuropathy prevented him from working was unsupported by the objective evidence in the record. *Id.* at 24 (citing opinion of Dr. Puestow that "the record reflects medically controlled atrial fibrillation, no

documented neuropathy, and no documented end organ damage in the context of diabetes."). Third, the ALJ reasoned that Campbell's degenerative disc disease was not "significantly problematic" because medical expert testimony characterized it as age-appropriate. *Id.* Fourth, the ALJ found that the overall record does not "indicate a work limiting mental condition," in part, because Campbell's depression was controlled "to the point where he could drive a commercial vehicle" as of January 22, 2018. *Id.* Finally, contrary to Campbell's testimony that he was denied a commercial driving position due to sleep apnea, the ALJ cited to "[s]ubsequent documentation [that] suggests he was approved for a commercial driving certification." *Id.*

The ALJ next considered the opinion evidence in the record. She gave "some weight" to consultative psychological examiner Dr. Feiden's opinion that Campbell's mental limitations were "not significant enough to interfere with daily functioning." *Id.* The ALJ concluded that the overall record supported Dr. Feiden's finding that Campbell had some mental limitations but none that precluded work, as Campbell was able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, and make appropriate decisions. *Id.* The ALJ also accorded "some weight" to state agency consultant Dr. Lieber-Diaz's opinion that Campbell had moderate limitations in some areas of functioning, but retained a residual functional capacity to meet the basic requirements of unskilled work. *Id.* at 25. In doing so, the ALJ reasoned that

Campbell's alleged depression did not appear to interfere with his normal daily functioning. *Id.*

The ALJ assigned "some weight" to consultative examiner Dr. Salon's opinion that there were no objective findings to demonstrate physical limitations on Campbell's ability to sit or stand, but he had limitations on his ability to push, pull, and carry heavy objects due to his prostate surgery. *Id.* at 26.  In particular, the ALJ observed that Dr. Puestow similarly found lifting limitations post-surgery, but noted that subsequent treatment notes were inconsistent with significant limitations. *Id.*  In addition, the ALJ gave "some weight" to state agency medical consultant Dr. Wells' opinion that Campbell could perform a range of medium work, including lifting and carrying 50 pounds occasionally and 25 pounds frequently, and sitting/standing/walking six out of eight hours. *Id.*  The ALJ found that Dr. Wells' opinion was consistent with the overall record, the opinion of Dr. Puestow, and with Campbell's urologist, Dr. Badani. *Id.*

The ALJ gave "significant weight" to Dr. Puestow's opinion that Campbell "could perform a range of medium work as adopted into the residual functional capacity above[.]" *Id.* at 28.  In reaching this determination, the ALJ considered Dr. Puestow's longitudinal review of the record evidence, his board certification in Internal Medicine and Endocrinology, and the recognition of Dr. Puestow as a medical expert. *Id.* at 29.

The ALJ accorded all of Campbell's treating physicians less than controlling weight.  The ALJ gave "some weight" to Dr. Badani's opinion that Campbell could

sit, stand, and walk more than six out of eight hours, lift or carry over 50 pounds occasionally and 25 pounds frequently, and would miss less than a day of work due to his impairments based on the consistency of the opinion with his treatment notes and the overall record, which indicated that Campbell had a "limitation for duration" and "medium [work] abilities." *Id.* at 26.  The ALJ gave primary care physician Dr. Patel's opinion that Campbell could only perform sedentary work "minimal weight" because Dr. Patel saw Campbell infrequently (at "six to twelve month intervals"), reported normal physical examinations in his treatment notes, and the opinion was inconsistent with that of Dr. Badani, who found Campbell could perform medium work. *Id.* at 27.  The ALJ also found Dr. Patel's opinion that Campbell was "unfit for work secondary to multiple medical problems" unsupported by evidence, routine, and conservative primary care. *Id.*  The ALJ observed that Dr. Patel's opinion, in essence, appeared to be elicited solely for litigation purposes. *Id.*

The ALJ gave the opinion of Dr. Salkin, Campbell's treating psychiatrist, "limited weight." *Id.* at 25.  The ALJ found Dr. Salkin's characterization of Campbell's limitations as "moderate to marked" to be inconsistent with the record. Specifically, the ALJ found that the record was devoid of any mental health hospitalizations, and that Dr. Salkin relied heavily on Campbell's subjective statements in making his assessment. *Id.*  In addition, the ALJ noted that Campbell took the same dosage of Wellbutrin from 2017 to 2018, and that the record did not demonstrate "significant clinical abnormalities." *Id.*  The ALJ

concluded that Dr. Salkin's January 2018 opinion that Campbell's depression was "fully controlled" was "inconsistent with any work-precluding limitations." *Id.*

At step four, the ALJ determined that Campbell could not perform his past relevant work as a construction worker. *Id.* at 29–30. At step five, based on the testimony of the VE and Campbell's demographic information, the ALJ found that jobs exist in the national economy that Campbell could perform, including work as an auto detailer, lunch truck driver, and hand packager. *Id.* at 30.

The ALJ considered hypotheticals that she posed and that Campbell's representative also presented to the vocational expert during the supplemental hearing, but declined to consider the VE's testimony regarding limitations on standing and walking, unlimited restroom breaks, unscheduled absences, unscheduled breaks, lifting weight, and being off-task during the work day, because she found that Campbell's allegations as to the severity of his conditions were not credible. *Id.* at 31. Accordingly, the ALJ concluded that the national economy had work in significant numbers that Campbell could perform, and found Campbell was "not disabled." *Id.* at 31–32.

## C. Analysis

Campbell argues that remand is warranted because the ALJ "failed to properly weigh the medical opinion evidence," primarily with respect to Dr. Salkin's opinion (Pl. Mem. at 9–17), the Appeals Council "failed to properly consider new evidence" (*id.* at 17–19), and the ALJ "failed to properly evaluate Campbell's subjective statements regarding his mental impairments" (*id.* at 19–22). In

45

response, the Commissioner contends that the ALJ properly addressed Campbell's subjective symptoms and that substantial evidence supports the ALJ's RFC determination.  Def. Mem. at 14, 16–23.  The Commissioner also claims that because the new evidence submitted to the Appeals Council is now part of the administrative record, and that substantial evidence still supports the ALJ's decision "notwithstanding" the new evidence (Dr. Ellis's report), remand is not appropriate.  *Id.* at 25.  The Court will address each argument in turn.

### 1.   The ALJ Failed to Properly Assess Dr. Salkin's Opinions

The ALJ assigned "limited weight" to Dr. Salkin's opinion, in part, because she determined that his assessment that Campbell had "moderate to marked" restrictions in various areas of mental functioning was inconsistent with his own "January 2018 opinion that the claimant's depression was totally controlled and he could drive a commercial vehicle."  AR at 25.  The ALJ further reasoned that Dr. Salkin's opinion was undermined by Campbell's conservative treatment—he took the same dosage of Wellbutrin and had infrequent, conservative care for his depression with no mental health hospitalizations—which indicated no "work-precluding limitations."  *Id.*  Moreover, the ALJ discounted Dr. Salkin's opinion because it "apparently relied quite heavily on [Campbell's] subjective reports."  *Id.*

Campbell argues that the ALJ erred because she violated the duty to develop the record by failing to obtain legible treatment notes from Dr. Salkin.  Pl. Mem. at 11.  He also argues that the ALJ erred in assigning Dr. Salkin's opinions limited weight, in part, because she improperly evaluated them by failing to discuss his

specialty (*id.* at 16–17), improperly discounted them because they relied on Campbell's subjective statements (*id.* at 10–11), and improperly found them inconsistent with Campbell's conservative treatment (*id.* at 12–13).  Campbell also argues that the ALJ improperly "credited the opinions from the non-treating sources over the opinions from treating psychiatrist Dr. Salkin," in part based on the mistaken belief that Dr. Salkin's opinion was inconsistent with the record (*id.* at 9, 12–13).  As discussed below, the ALJ violated the duty to develop the record by failing to clarify Dr. Salkin's notes and by violating the treating physician rule in failing to properly weigh Dr. Salkin's opinions.  As a result of these errors, remand is warranted.

### a.    The ALJ Failed to Develop the Record as to Dr. Salkin

As a threshold matter, the ALJ violated her duty to develop the record by failing to seek clarification of Dr. Salkin's treatment notes.  "[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record' and, 'where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history.'"  *Hidalgo v. Colvin*, No. 12-CV-9009 (LTS) (SN), 2014 WL 2884018, at *4 (S.D.N.Y. June 25, 2014) (quoting *Rosa*, 168 F.3d at 79).  Courts have found that the ALJ's obligation to develop a full record also extends to clarifying illegible medical evidence in the record.  *See, e.g., Connor v. Barnhart*, No. 02-CV-2156 (DC), 2003 WL 21976404, at *8 (S.D.N.Y. Aug. 18, 2003) ("[C]ourts have held that illegibility of important medical records is a factor in warranting a remand for clarification and supplementation." *Id.* (quoting *Vaughn v. Apfel*, No. 98-CV-0025 (HB), 1998 WL

856106, at *7 (S.D.N.Y. Dec. 10, 1998))).  "[T]his duty to develop the record is

particularly important where an applicant alleges he is suffering from a mental

illness, due to the difficulty in determining 'whether these individuals will be able

to adapt to the demands or 'stress' of the workplace.'" *Id*.  "Whether the ALJ has

met [her] duty to develop the record is a threshold question" that the Court must

determine "[b]efore reviewing whether the Commissioner's final decision is

supported by substantial evidence."  *Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d

249, 261 (S.D.N.Y. 2016).

Here, contrary to the Commissioner's assessment, Def. Mem. at 19, the

majority of Dr. Salkin's treatment notes, which cover approximately three years of

treating Campbell, are illegible.  *See, e.g.,* AR at 495–500, 540–70.  As Campbell's

primary mental health treating physician, Dr. Salkin would likely provide directly

relevant and irreplaceable information about Campbell's depression which could, in

turn, support his claim for disability.  Despite the relevance of his notes, the ALJ

failed to request or otherwise obtain legible notes from Dr. Salkin.  It is well-

established that when records relevant to a plaintiff's claim are illegible, as they are

here, the ALJ's failure to seek clarification of those records warrants remand.  *See,*

*e.g., Pratts*, 94 F.3d at 38 (remand warranted where "frequently incomplete or

illegible" medical records "provide[d] no coherent overview of [claimant's]

treatment"); *Sanchez v. Saul*, No. 18-CV-12102 (PGG) (DCF), 2020 WL 2951884, at

*34  (S.D.N.Y. Jan. 13, 2020) (recommending case be remanded with instruction for

ALJ to seek clarified copies of illegible handwritten notes from claimant's treating

physician, which "may be material to an assessment of the extent of her exertional impairments"), *adopted sub nom. Sanchez v. Comm'r of Soc. Sec.*, 2020 WL 1330215, at *2 (S.D.N.Y. Mar. 23, 2020); *Velez v. Berryhill*, No. 17-CV-6551 (BCM), 2018 WL 4609110, at *11 (S.D.N.Y. Sept. 25, 2018) (illegibility of treating physician's notes warranted remand).  Indeed, without legible medical records, there is no way to determine "whether the illegible information in these reports might have provided further support for plaintiff's claim." *Miller v. Barnhart*, No. 03-CV-2072 (MBM), 2004 WL 2434972, at *9 (S.D.N.Y. Nov. 1, 2004) (quoting *Jimenez v. Massanari*, No. 00-CV-8957 (AJP), 2001 WL 935521 (S.D.N.Y. Aug. 16, 2001)) (remand warranted where ALJ failed to seek "more detailed and clearer statements" from treating physicians and medical reports in administrative record were illegible).

Nor can the Court determine "whether the ALJ's main reason for discounting [the treating physician's] opinions . . . is supported by substantial evidence.'" *Velez*, 2018 WL 4609110, at *11 (citing *Silva v. Colvin*, No. 6:14-CV-6329 (MAT), 2015 WL 5306005, at *5 (W.D.N.Y. Sept. 10, 2015)); *see also Garretto v. Colvin*, No. 15-CV-8734 (HBP), 2017 WL 1131906 at *18–20 (S.D.N.Y. Mar. 27, 2017) (ALJ's failure to seek legible and missing treatment notes from claimant's treating physician led to "obvious gap" in record "that may have affected the ALJ's disability determination," thus warranting remand).  Here, the ALJ gave less-than-controlling weight to Dr. Salkin's opinions because of inconsistencies between his opinions dated April 10, 2017 and March 12, 2018 (which reported a variety of mental limitations) and a note from Dr. Salkin to Dr. Marc dated January 22, 2018 (in which Dr. Salkin

opined that Campbell's depression was under control).  *See* AR at 25, 578.  However,

without the benefit of legible versions of Dr. Salkin's notes, which likely contain

information relevant to Campbell's depression over a period of approximately three

years (AR at 542–55, 570), it is unclear whether the ALJ properly weighed Dr.

Salkin's opinions and correctly afforded them the weight they deserved.  *See, e.g.,*

*Silva*, 2015 WL 5306005, at \*5 (remanding where ALJ failed to obtain legible

treating notes in determining to afford little weight to treating physician opinions

due to inconsistencies); s*ee also Velez*, 2018 WL 4609110 at \*11 (court could not

engage in "required 'plenary review' of the administrative record, [] if the most

'significant medical evidence' was indecipherable").  Accordingly, the ALJ's failure

to develop the record with respect to Dr. Salkin's treatment notes warrants remand.

### b.    The ALJ Failed to Properly Evaluate Dr.  Salkin's Opinion as One Coming From a Treating Physician

As for the ALJ's weight determination for Dr. Salkin's opinion, the Court

concludes that the ALJ improperly evaluated Dr. Salkin's opinion by failing to

consider all of the *Burgess* factors.  In deciding to give Dr. Salkin's opinion less than

controlling weight, the ALJ was required to "comprehensively set forth reasons for

the weight" according to the *Burgess* factors.  *Halloran*, 362 F.3d at 32-33.  While

the Second Circuit "does not require 'slavish recitation of each and every factor,' the

ALJ's 'reasoning and adherence to the regulation' still must be clear from his

opinion."  *Cabrera v. Comm'r of Soc. Sec.*, No. 16-CV-4311 (AT) (JLC), 2017 WL

3686760, at \*3 (S.D.N.Y. Aug. 25, 2017) (citing *Atwater v. Astrue*, 512 F. App'x. 67,

70 (2d Cir. 2013)).  If the ALJ does not "explicitly" consider these factors, the case

must be remanded unless "a searching review of the record" assures the Court that the ALJ applied "the substance of the treating physician rule." *Estrella*, 925 F.3d at 95.

Here, in giving Dr. Salkin's opinions little weight, the ALJ erred by failing to consider two *Burgess* factors: Dr. Salkin's specialty as a psychiatrist and the nature and extent of Campbell's treatment relationship with him.  First, the ALJ failed to consider Dr. Salkin's expertise as a psychiatrist.  Although the ALJ stated that "the claimant saw a therapist and psychiatrist for mental health treatment" and otherwise noted Dr. Salkin's title as a psychiatrist, *see* AR at 19, 23, 25–28, she failed to explicitly consider that Dr. Salkin was a specialist in weighing her opinion, as required.  *See, e.g., Selian,* 708 F.3d at 418 (citing *Burgess,* 537 F.3d at 129). Failure to explicitly weigh a treating physician's specialty when affording less than controlling weight is an error that warrants remand.  *See, e.g., Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 508 (S.D.N.Y. 2014) (failure to explicitly consider treating physician's specialty as psychiatrist when giving no weight to opinion warranted remand); *Veresan v. Astrue*, No. 06-CV-5195 (JG), 2007 WL 1876499, at *5 (E.D.N.Y. June 29, 2007) (failure to "indicate what weight, if any, was given to the fact that those doctors are specialists" made it impossible "to determine the extent to which the ALJ considered those factors in reaching its determination"). Accordingly, the ALJ erred by affording Dr. Salkin's opinion limited weight without considering his specialty in psychiatry.

The ALJ also failed to consider the length, nature, and extent of Campbell's treatment relationship with Dr. Salkin.  Although she addressed the frequency of treatment provided by Dr. Salkin ("one to three month intervals") and described the treatment as "psychiatric" (*id.* at 23), the ALJ failed to explicitly consider the length of the treatment (2015 to 2018) and did not provide any discussion of the nature and extent of Campbell's treatment relationship with Dr. Salkin.  Indeed, as discussed above, Dr. Salkin's treatment notes are illegible and, as a result, the ALJ was precluded from reviewing his regular observations of Campbell.  *See, e.g., Medina v. Comm'r of Soc. Sec.,* No. 13-CV-2323 (KAM), 2016 WL 4402010, at *2 (E.D.N.Y. Aug. 18, 2016) ("the precise nature and extent of the treating relationship remains somewhat unclear" due to illegible treatment notes); *Sarchese v. Barnhart,* No. 01-CV-2172 (JG), 2002 WL 1732802, at *5 (E.D.N.Y. July 19, 2002) (case remanded in part because "length of the relationship was mentioned only in passing in the ALJ's opinion"); *see generally Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.") (citing *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir. 1998)).

The ALJ's failure to properly consider these two *Burgess* factors in affording Dr. Salkin's opinion less than controlling weight is not harmless error.  As of September 2018, Dr. Salkin opined that Campbell's "[d]epression makes him unable to work" and found that Campbell would likely miss work more than three times per month.  AR at 59, 61.  In his previous opinions, Dr. Salkin opined that Campbell would likely miss work more than three times per month (*id.* at 500) and two to

three times per month (*id.* at 619).  These opinions are particularly significant when considered in light of the VE's testimony that employers in unskilled and entry-level occupations would consider one absence per month for three consecutive months excessive and that some employers may only tolerate one absence for two consecutive months, but that tolerance would vary according to the particular employer and its probationary period.  *Id.* at 81.  Therefore, it "'cannot be said that the ALJ's analysis of [the treating physician's] opinions was harmless error because the [vocational expert] essentially testified that if these opinions were adopted, [Campbell] would be unable to work.'"  *Pines v. Comm'r of Soc. Sec.*, No. 13-CV-6850 (AJN) (FM), 2015 WL 872105, at *10 (S.D.N.Y. Mar. 2, 2015) (quoting *Archambault v. Colvin*, No. 2:13-CV-292, 2014 WL 4723933, at *10 (D. Vt. Sept. 23, 2014), *adopted by* 2015 WL 1381524 (S.D.N.Y. Mar. 25, 2015)).

In sum, the ALJ's failure to discuss Dr. Salkin's specialization or his treating relationship with Campbell when assigning his opinion less than controlling weight is legal error that warrants remand.  *See, e.g., Cabrera*, 2017 WL 3686760, at *3; *see also Ramos v. Comm'r of Soc. Sec,* No. 13-CV-3421 (KBF), 2015 WL 7288658, at *7 (S.D.N.Y. Nov. 16, 2015) (remanding where ALJ did not consider specialization and length of treatment in weighing opinion of treating physician); *Clark v. Astrue,* No. 08-CV-10389 (LBS), 2010 WL 3036489, at *4 (S.D.N.Y. Aug. 4, 2010) (failure to consider "whether the opinion was from a specialist" was "legal error [that] constitute[d] grounds for remand") (internal quotation marks omitted).

### c.   The ALJ Improperly Discounted Dr. Salkin's Opinion Based on His Reliance on Campbell's Subjective Statements

The ALJ also erred by discounting Dr. Salkin's opinion on the basis of his apparent reliance on Campbell's subjective reports regarding his symptoms.  AR at 25.  Specifically, the ALJ assigned Dr. Salkin's opinions limited weight because he "apparently relied quite heavily on the subjective reports of symptoms and limitations provided by the claimant."  *Id.* at 25, 27–28.  However, a treating physician's reliance on subjective complaints does not undermine his or her opinion because "'[a] patient's report of complaints, or history, is an essential diagnostic tool.'"  *Burgess,* 537 F.3d at 128 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003)).  Reliance on a claimant's reporting is especially important in the context of mental impairments, because "unlike orthopedists, for example, who can formulate medical opinions based upon objective findings derived from objective clinical tests, scans or x-rays, a psychiatrist typically treats the patient's subjective symptoms or complaints about those symptoms."  *Santana v. Astrue*, No. 12-CV-815 (BMC), 2013 WL 1232461, at *14 (E.D.N.Y. Mar. 26, 2013).  Accordingly, the ALJ erred by discounting Dr. Salkin's opinion on the ground that his assessment relied heavily on Campbell's account of his symptoms.  *See, e.g., McGregor v. Astrue*, 993 F. Supp. 2d 130, 141 (N.D.N.Y. 2012) (ALJ erred by discounting consultative examiner's reports where examiner "appropriately used Plaintiff's subjective complaints as a diagnostic tool").

### d.   The Court Cannot Determine Whether the ALJ Erred in Evaluating Campbell's Mental Health Treatment as Conservative

The ALJ found that Dr. Salkin's opinions about Campbell's mental limitations were inconsistent with his lack of psychiatric hospitalizations and overall conservative course of mental health treatment, and were not supported by any "significant clinical abnormalities" in the record.  AR at 25.  Campbell argues that the ALJ erred by relying on the lack of hospitalizations or treatment by medication as evidence that Campbell is not disabled.  Pl. Mem. at 12–13.  The Court finds that the ALJ properly discussed Campbell's conservative treatment for his depression; however, the Court cannot determine on the current record whether the ALJ's evaluation that the treatment was conservative is supported by substantial evidence.

Courts have found that conservative treatment may support a conclusion that the claimant is not disabled so long as "that fact is accompanied by other substantial evidence in the record." *Burgess*, 537 F.3d at 129; *Dolan v. Berryhill*, No. 17-CV-4202 (GBD) (HBP), 2018 WL 4658804, at *17 (S.D.N.Y. July 24, 2018) ("A claimant's conservative treatment regimen is a relevant factor that an ALJ may consider in making his RFC determination."), *adopted by* 2018 WL 3991496 (S.D.N.Y. Aug. 21, 2018).  While the absence of any psychiatric hospitalization does not, without more, prove conservative treatment, the ALJ may nonetheless take into account a lack of hospitalization as one piece of evidence to establish conservative care.  *See, e.g., Johnson v. Astrue*, No. 1-CV-6975 (RWS), 2013 WL 1395693, at *7 (S.D.N.Y. Apr. 5, 2013) (no error where ALJ considered

conservative care and lack of hospitalization in evaluating claimant's credibility). Here, the ALJ properly discussed the lack of "mental health hospitalizations," as one aspect of Campbell's mental health care, accompanied by a lack of "significant clinical abnormalities," consistent dosage of medication, and conservative care.  AR at 25–28.  *See, e.g., Selimaj v. Berryhill*, No. 17-CV-3389 (KMK), 2019 WL 1417050, at *9 (S.D.N.Y. Mar. 29, 2019) ("Although it is true that an ALJ 'may not impose [her] . . . notion[ ] that the severity of a[n] . . . impairment directly correlates with the intrusiveness of the medical treatment ordered,' it is evident here that the ALJ considered [the claimant's] treatment collectively with the other evidence in the record.") (citations omitted).

Nevertheless, the Court cannot determine whether the ALJ's finding of conservative treatment is supported by substantial evidence because there exist significant gaps in the administrative record with respect to Campbell's mental health treatment, as described above.  On remand, the ALJ should revisit this issue in light of the full record, including Dr. Salkin's notes concerning Campbell's depression, and any other evidence in the record that bears on Campbell's treatment.

### 2. The Appeals Council Erred by Failing to Consider New Evidence

Campbell also argues that the Appeals Court erred by failing to properly consider new evidence from examining psychologist, Dr. Ellis.  Pl. Mem. at 17–19. Specifically, Campbell contends that the Appeals Council's reasoning for rejecting this new evidence—that it did not relate to the period at issue—ignored the

retrospective nature of the evidence.  *Id.* at 18.  In addition, Campbell argues that

he has met all other requirements for the admission of new evidence.  *Id.* at 18–19.

The Commissioner counters that a remand for "further consideration" of Dr. Ellis's

report is unwarranted because, "notwithstanding Dr. [Ellis's] report, substantial

evidence supports the ALJ's decision."  Def. Mem. at 25.

     In order to admit additional evidence, the claimant must meet the three-part

test summarized by the Second Circuit as follows:

> [A]n appellant must show that the proffered evidence is
> (1) "new" and not merely cumulative of what is already in
> the record, ... and that it is (2) material, that is, both
> relevant to the claimant's condition during the time
> period for which benefits were denied and probative....
> The concept of materiality requires, in addition, a
> reasonable possibility that the new evidence would have
> influenced the [Commissioner] to decide claimant's
> application differently.... Finally, claimant must show (3)
> good cause for her failure to present the evidence earlier.

*Patterson v. Colvin*, 24 F. Supp. 3d 356, 372 (S.D.N.Y. 2014) (quoting

*Lisa v. Sec'y of Dep't of Health & Human Servs. of U.S.*, 940 F.2d 40, 43

(2d Cir. 1991)) (internal quotations and citations omitted).

     Courts "have not hesitated to remand for the taking of additional evidence,

on good cause shown, where relevant, probative, and available evidence was either

not before the secretary or was not explicitly weighed and considered by him,

although such consideration was necessary to a just determination of a claimant's

application." *Cutler v. Weinberger,* 516 F.2d 1282, 1285 (2d Cir. 1975).

     Here, the evidence at issue is a three-page psychiatric evaluation and a

Psychiatric/Psychological Impairment Questionnaire completed by Dr. Ellis on

November 12, 2018.  AR at 39–48.  These reports diagnosed Campbell with, among
other things, "[m]ajor depressive disorder, recurrent, without psychotic features []
with moderate-severe anxious distress."  *Id.* at 48.  Dr. Ellis also diagnosed
Campbell with a relational problem related to a mental disorder.  *Id.*  The reports
also indicated a variety of work-related limitations resulting from Campbell's
mental state.  *Id.* at 39–48.  For example, Dr. Ellis found that Campbell had marked
limitations in almost all areas of "[a]daptation" except one, and marked limitations
in four areas of "concentration and persistence" (specifically in his ability to
"maintain attention and concentration for extended periods"; "work in coordination
with or near others without being distracted by them"; "complete a workday without
interruptions from psychological symptoms" and "perform at a consistent pace
without rest periods of unreasonable length or frequency").  *Id.* at 42.

　　With respect to the first prong of the test for additional evidence, the
evidence at issue is new as the evaluation and questionnaire were both completed
on November 12, 2018, several months after the ALJ's decision was rendered.  *Id.* at
46.  The evidence is also not cumulative of information that already exists in the
record: there is no other report or evaluation from Dr. Ellis in the record, nor is
there any other evidence diagnosing Campbell with "major depressive disorder . . .
with moderate-severe anxious distress" or a relational disorder.  *Id.* at 46–48.[19]

---

[19] Dr. Salkin diagnosed Campbell with major depressive disorder and identified
"[p]ersistent or generalized anxiety" as a sign or symptom, but his opinion did not
establish any diagnosis relating to anxious distress.  *Id.* at 57–58, 496, 616.

Dr. Ellis's opinions also satisfy the second prong, which requires the new evidence to be material and relevant to the time period at issue. Dr. Ellis reported that Campbell's symptoms and limitations applied as far back as March 1, 2015, which implicates the period at issue here. *Id.* at 43, 131 (Campbell's alleged onset date of disability is November 20, 2015). Moreover, Dr. Ellis's opinion is material to the RFC determination. Dr. Ellis assessed more severe limitations in Campbell's mental functioning, including marked limitations in his concentration and persistence, than that incorporated in the RFC determination. *See, e.g., id.* at 20 (RFC determination finding Campbell could sustain attention and concentration for two-hour segments of time); *id.* at 42 (Dr. Ellis opined that Campbell has marked limitations in ability to maintain attention and concentration for extended periods). Dr. Ellis also opined that Campbell would likely be absent from work more than three times per month (*id.* at 43), which, if credited, would likely disqualify him from certain occupations identified by the VE (*id.* at 81 (testifying that employers would find one absence for three consecutive months excessive or, depending on the employer's tolerance, one absence for two consecutive months)). Significantly, Dr. Ellis's findings as to Campbell's mental limitations and the likely amount of absences from work provide support for Dr. Salkin's opinion, who similarly found marked limitations in Campbell's concentration and persistence and also found that Campbell would likely be absent more than three times per month from work. *Id.* at 60–61. Therefore, the new evidence provided by Dr. Ellis is likely to affect the RFC determination and ultimate finding of disability.

Finally, with respect to the third prong, good cause exists for Campbell's failure to have presented the evidence at an earlier time because Dr. Ellis's evaluation and questionnaire were completed on November 12, 2018—*i.e.*, after the initial ALJ hearing (on March 20, 2018) and the supplemental hearing (on August 15, 2018). *Id.* at 39, 62, 85.

Accordingly, the Appeals Council erred by not admitting Dr. Ellis's evaluation and questionnaire and remand is warranted on this basis as well so that the ALJ can consider this new evidence in determining Campbell's claim of disability. *See, e.g., Crowley v. Colvin,* No. 13-CV-1723 (AJN) (RLE), 2014 WL 4631888, at *4–5 (S.D.N.Y. Sept. 15, 2014) (new evidence warranted remand because it met three-part test outlined by the Second Circuit and provided "support for [claimant's] alleged psychiatric impairments"); *Sergenton v. Barnhart,* 470 F. Supp. 2d 194, 204–05 (E.D.N.Y. 2007) (remand warranted where new medical evidence reflected severe impairment and presented "reasonable possibility of influencing the Secretary to decide her application differently").

### 3.  Campbell's Subjective Statements Regarding His Mental Impairments Should be Reevaluated on Remand

As to his credibility, Campbell argues that the ALJ did not properly evaluate his statements regarding his depression because she failed to consider his symptoms, limitations arising from those symptoms, activities of daily living, and treatment.  Pl. Mem. at 21–22.  In response, the Commissioner contends that the ALJ did not err in her analysis, but properly found that Campbell's subjective symptoms were inconsistent with the evidence in the record, correctly observed that

the record did not contain any abnormal clinical findings, and appropriately considered Campbell's ability to obtain a commercial driver's license and the limitations of Campbell's symptoms in his daily life.  Def. Mem. at 23–24.  Thus, the Commissioner argues that substantial evidence supports the ALJ's findings concerning Campbell's credibility.  *Id.* at 24.

As an initial matter, because Campbell reported symptoms that were "more severe than medical evidence alone would suggest, SSA regulations require the reviewing ALJ to consider additional evidence, including a specific set of factors, in determining the credibility of a plaintiff's symptoms and their limiting effects." *McClinton v. Colvin,* No. 13-CV-8904 (CM) (MHD), 2015 WL 5157029 at *30 (S.D.N.Y. Sept. 2, 2015) (quoting SSR 96–7p), *adopted by* 2015 WL 6117633 (S.D.N.Y. Oct. 16, 2015).  Those factors are: "(1) The individual's daily activities; (2) [t]he location, duration, frequency and intensity of pain or other symptoms; (3) [f]actors that precipitate and aggravate the symptoms; (4) [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.,* lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." *Id.* at 31 (quoting 20 C.F.R. § 416.929(a)).

Here, the ALJ found that while Campbell's medically determinable impairments could reasonably cause his alleged symptoms, his statements regarding the "intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." AR at 23.  The ALJ then examined the above-cited factors in assessing the credibility of Campbell's symptoms and their limiting effects.  Contrary to Campbell's argument that she did not consider "any of the factors that relate to [his] mental impairments" (Pl. Mem. at 21–22), the ALJ explicitly considered Campbell's daily activities of visiting the park where he feeds birds and reads (*id.* at 19); that his depression developed following his lung cancer diagnosis in 2007 (*id.* at 19); his use of Wellbutrin at the same dosage to treat his depression (*id.* at 25); his bi-monthly therapist and monthly psychiatry appointments (*id.* at 22); and his control over his depression as of January 22, 2018, evidenced by the fact that he "could drive a commercial vehicle" (*id.* at 24).  However, the Court is unable to determine whether the ALJ properly evaluated the duration, frequency, and intensity of Campbell's depression, which she found was non-severe and caused no limitations (*id.* at 19–20, 25) because, as discussed above, she did not have legible treating notes from Dr. Salkin.  Accordingly, the Court directs the ALJ to revisit Campbell's credibility on remand after fully developing the record.

### 4.     The ALJ Did Not Fully Develop the Record as to Campbell's Heart Impairments

Although the parties did not address this issue in their papers, the ALJ should also develop the record with respect to Campbell's congestive heart failure

disorder on remand as well.  First, it does not appear that the record contains any stress test results or that the ALJ attempted to retrieve stress test records, despite the fact that the record indicates that Campbell had a stress test in February 2017. *Id.* at 531–32.  This is of particular importance in light of  Dr. Kustar's testimony that he did not find any objective evidence in the record to corroborate Campbell's diagnosis of congestive heart failure, and that he would need more information including "echos," "heart caths," or a "stress test" to formulate an opinion regarding Campbell's heart condition.  *Id.* at 68.  Moreover, it appears that Campbell was treated by Dr. Rajendera Patel for his congestive heart failure.  *See* AR at 312–13 (Campbell self-reporting that Dr. Rajendera Patel prescribed Amlodipine and Furosemid to treat his congestive heart failure and Losartan for high blood pressure).  However, there are no medical records or evidence from Dr. Rajendera Patel in the administrative record.  Instead, it only contains medical evidence from another doctor with the last name of Patel, Dr. Girish Patel.

The stress test records and Dr. Rajendera Patel's records may suggest further limitations to Campbell's physical abilities that are not accounted for in the RFC determination, which found that Campbell could "lift/carry fifty pounds occasionally and twenty-five pounds frequently; sit eight of eight hours, four hours at a time; and stand/walk six of eight hours, three hours at a time . . . frequently climb ramp/stairs, balance, stoop, kneel, crouch, and crawl." *Id.* at 20.  Accordingly, on remand, the ALJ should make a reasonable effort to obtain the results of Campbell's stress test and contact Dr. Rajendera Patel for any additional treatment

63

or medical records concerning Campbell's heart condition and, once the record is further developed on this issue, she should reevaluate Campbell's heart condition when making her RFC determination.  *See, e.g., Reff v. Saul,* No. 18-CV-6878 (PKC), 2020 WL 1550635 (E.D.N.Y. Mar. 31, 2020) (case remanded in part because diagnostic tests missing from the record).

## III.   CONCLUSION

For the foregoing reasons, the Court grants Campbell's motion for judgment on the pleadings, denies the Commissioner's cross-motion, and remands the case pursuant to sentence four of 42 U.S.C. § 405(g).  Specifically, on remand, the ALJ should:

(1) Obtain legible copies of Dr. Salkin's treatment notes and reconsider the appropriate weight to give to Dr. Salkin's opinions in light of the new information;

(2) Consider the new evidence of Dr. Ellis's evaluation and questionnaire;

(3) Reevaluate Campbell's subjective statements about his mental impairments upon a fully developed record; and

(4) Further develop the record by requesting documentation of Campbell's stress test and medical records from Dr. Rajendera Patel, and reevaluate the limitations of his congestive heart failure disorder.

Dated: August 10, 2020
    New York, New York

_____
JAMES L. COTT
United States Magistrate Judge

64